**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



====================================

JACK SALTZ as Trustee of
SUSAN SALTZ CHARITABLE LEAD
ANNUITY TRUST, and SUSAN SALTZ
DESCENDANTS TRUST, and SUSAN
SALTZ,

               **Plaintiffs,**

        *- versus -*

FIRST FRONTIER, L.P., FRONTIER
CAPITAL MANAGEMENT, LLC,
FRONTIER ADVISORS CORP.,
MARK OSTROFF, "FNU" OSTROFF,
BEACON ASSOCIATES, LLC I,
BEACON ASSOCIATES MANAGE-
MENT CORP., IVY ASSET MANAGE-
MENT CORP., THE BANK OF NEW
YORK MELLON CORP., JOEL DANZIGER,
ESQ., HARRIS MARKHOFF, ESQ., ANCHIN,
BLOCK & ANCHIN, LLP, and JOHN DOES
1 through 100,

               **Defendants.**

====================================

**10 CIV 00964**

**CIVIL ACTION No.**

**JUDGE COTE**

**Jury Trial Demanded**
**Fed. R. Civ. P. 38(a)**

   Plaintiff JACK SALTZ, as Trustee of SUSAN SALTZ CHARITABLE LEAD

ANNUITY TRUST ("SCLAT"), and SUSAN SALTZ DESCENDANTS TRUST

("SDT"), and SUSAN SALTZ (hereinafter referred to as "Plaintiffs"), allege upon the

investigation made by and through their counsel, complaints filed by the United

States government and the Securities and Exchange Commission (the "SEC"), and

reports and interviews published in the financial press, and upon information and

belief, as follows:

1

## I. SUMMARY OF THE ACTION

1. This case arises from a massive, fraudulent scheme perpetrated by Bernard L. Madoff ("Madoff") through his investment firm, Bernard L. Madoff Investment Securities, LLC ("BLMIS"), and others, and which was facilitated by the defendants named herein, who, recklessly or with gross negligence and/or in breach of fiduciary duties owed to Plaintiffs and, caused and permitted the Fund's assets to be invested with Madoff.

2. On December 10th, 2008, Madoff informed his sons that his investment advisory business, BLMIS, was a complete fraud. Madoff stated that he was "finished," that he had "absolutely nothing," and that "it's all just one big lie." He confessed he had been running "basically, a giant Ponzi scheme." Madoff admitted that the business was in-solvent and that it had been so for years. Madoff furthermore stated that he estimated the losses from this fraud to be approximately $50 billion. Published reports now indicate that Madoffs estimate may be conservative and the losses will not be fully known until the full effect of the fraud is understood.[1]

3. On December 11th, 2008, Madoff's fraud was exposed and the SEC charged both Madoff and BLMIS with securities fraud. Criminal charges were also filed against Madoff individually for, among other things, securities, wire, and mail fraud. *United States v. Madoff*, 09-cr-0213 (DC). When he was arrested, Madoff was quoted as saying "there is no innocent explanation" for what had happened and that he "paid investors with money that wasn't there." On March 12th, 2009 Madoff pled Guilty before the Hon.

---

[1] As just one sign of the immense nature of the Madoff fraud, the district court issued a $171 billion forfeiture order against Madoff on June 29, 2009.

Denny Chin, U.S.D.J., S.D.N.Y., and, on June 29th, 2009, was sentenced to one hundred fifty years imprisonment. In short, Madoff and his cohorts, knowing aiders and abettors, and those parties and entities that consciously avoided their fiduciary and legal responsibilities to their clients (such as the named Defendants herein) operated a massive Ponzi scheme the likes of which are unparalleled and will likely never even be approached in terms of number of victims and amounts involved.[2]

4. Madoff would have been unable to perpetrate this massive fraud without the knowing, or grossly negligent conscious avoidance of responsibility and fiduciary and statutory and regulatory assistance, connivance and aiding and abetting by the numerous entities that assisted him. Because the minimum investment amount accepted by Madoff was quite high, feeder funds and aggregators such as the Defendants named herein pooled the investments of numerous individuals, who could only invest smaller amounts, into a collective fund for transmission to Madoff. Numerous funds of funds ("FOF"), feeder funds ("FF"), investment advisors, accountants, attorneys, and affiliates, including the named and un-named defendants, facilitated Madoff's fraud, by investing, and allowing to be invested, billions of dollars of their clients' money with Madoff and his related entities without performing adequate due diligence despite the existence of repeated, numerous and obvious "red flags."[3] These "red flags" included, among others, the abnormally high and stable positive investment results reportedly obtained by Madoff

---

[2] As one minor example, on April 1st, 2009 the FBI issued a press release detailing major Ponzi schemes uncovered in the first quarter of the year. The largest ones were a "mere" billion dollars, less than one percent of the size of Madoff's fraud.
See http://www.fbi.gov/pressrel/pressrel09/ponzi040109.htm.

[3] See discussion at ¶¶ 62-68 *infra*.

regardless of market conditions; inconsistencies between BLMIS's publicly available financial information concerning its assets and the purported amounts that Madoff managed for clients; and the fact that BLMIS was audited by a small, obscure accounting firm with no experience auditing entities of the apparent size and complexity of BLMIS. Despite having failed to perform the most basic due diligence, these FOFs, FFs, investment advisors, accountants, attorneys, other licensed professionals, and affiliates were paid large management and advisory fees by their clients, often for doing little more than blindly handing over their clients' funds to Madoff or his related entities, without exercising any supervisory, fiduciary or management responsibilities whatsoever.

5. Defendant FIRST FRONTIER, LP, (the "Fund")[4] is a Delaware limited partnership created in December 1998. The General Partner thereof is Defendant FRONTIER CAPITAL MANAGEMENT, LLC. The General Manager of Defendant FIRST FRONTIER, LP is Defendant MARK OSTROFF, and the Manager is Defendant FRONTIER ADVISORS CORP., Defendant MARK OSTROFF, designated as President thereof. The Principal Member and Sole Manager of Defendant FRONTIER CAPITAL MANAGEMENT, LLC is Defendant MARK OSTROFF. Listed as the other Principal Manager is Defendant "FNU" OSTROFF, the spouse of Defendant MARK OSTROFF. Defendant ANCHIN, BLOCK & ANCHIN, LLP are the auditors for Defendant FIRST FRONTIER, LP, and provided annual and other financial reports for the limited partnership.

---

[4] Hereinafter and throughout this Complaint, Plaintiffs shall use the term "Fund" as a catchall to refer to the actions of FIRST FRONTIER, LP, and all of its related entities and parties as set forth in ¶¶ 18 through 29, and to the actions of BEACON ASSOCIATES, and all of its related entities and parties as set forth in ¶¶ 30 through 35. Actions specific to one or another separate entities shall so enumerate that entity or person.

6. As a result of Plaintiffs' investment in the Funds her investments have been decimated and she has suffered losses in the millions of dollars, as will be detailed *infra*. These losses are directly and indirectly attributable to the reckless and/or grossly negligent dereliction of their fiduciary duties, and the complete failure of the Fund's auditor, to perform adequate and minimal due diligence despite the existence of myriad red flags indicating that a high concentration of the Fund's assets were ultimately invested in Madoff related investments.

7. Defendants FIRST FRONTIER, LP, FRONTIER CAPITAL MANAGEMENT, LLC, and MARK OSTROFF, among others, invested most, if not all of the funds received from Plaintiffs with Defendant BEACON ASSOCIATE MANAGEMENT CORP.

8. Defendant BEACON ASSOCIATE MANAGEMENT CORP. ("Beacon Associates" or the "Managing Member"), which is wholly owned by defendants JOEL DANZIGER, ESQ., HARRIS MARKHOFF, ESQ. and their immediate families, was the "Managing Member" thereof. The Fund's "Investment Consultant" was defendant IVY ASSET MANAGEMENT CORP. ("Ivy Asset Management"), which is a wholly owned subsidiary of defendant THE BANK OF NEW YORK MELLON CORPORATION. Plaintiffs' investment in Beacon Associates was decimated as a direct result of Beacon Associates and Ivy Asset Management's reckless and/or grossly negligent dereliction of their fiduciary duties, and the complete failure of Friedberg Smith & Co. ("Friedberg Smith"), Beacon Associate's auditor, to perform adequate due diligence, and be aware of

the existence of myriad red flags indicating that a high concentration of the Fund's assets were ultimately invested in Madoff related investments.

9. In fact, as a result of the defendants' conduct, Beacon Associates, upon information and belief, has been forced into liquidation, and most of Plaintiffs' investments have been lost.

10. Plaintiffs seek to recover damages caused by defendants' violation of Section 10(b) and 20(a) of the Securities Exchange Act of 1934, as well as for common law fraud, negligent misrepresentation and breach of fiduciary duty under New York law. Plaintiffs also seek to recover derivatively for breach of fiduciary duty, gross negligence and mismanagement, and common law fraud.

## II. JURISDICTION AND VENUE

11. The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (see *Chiarella v. United States*, 445 U.S. 222, 226 (1980)) and § 78t(a) (see *SEC v. Pimco Fund Management, LLC*, 341 F. Supp.2d 454, 467-68 (S.D.N.Y. 2004)), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b 5, as well as under the laws of the State of New York.

12. This Court has jurisdiction in this action pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (*see, e.g., Campito v. McManus*, 470 F. Supp. 986, 995 (N.D.N.Y. 1979)), and the supplemental jurisdiction of this Court. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331

(federal question jurisdiction, see *Fiero v. Financial Indus. Regulatory Auth.*, 606 F.

Supp.2d 500, 508-09 (S.D.N.Y. 2009)) and § 1337(a), Section 22 of the Securities Act of

1933, 15 U.S.C. § 77v(a).

13. Venue is proper in this judicial district pursuant to Section 22(a) of the Securities

Act of 1933, 15 U.S.C. §77v; Section 27 of the Securities Exchange Act of 1934, 15

U.S.C. § 78aa and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged

fraud and/or its effects have occurred within this District. Additionally, all named

defendants maintain their headquarters or conduct substantial business in this District.

14. In connection with the acts alleged in this Complaint, defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the mails, interstate telephone communications and the facilities of the

national securities markets.

15. This action is brought within the relevant statute of limitations period; there being

no statute of limitations for actions brought under Rule 10b-5 and for securities fraud, the

relevant period being that applicable under state law. See *Ernst & Ernst v. Hochfelder*,

425 U.S. 185, 210 n. 29 (1976) ("Since no statute of limitations is provided for civil

actions under s 10(b), the law of limitations of the forum State is followed as in other

cases of judicially implied remedies."). Under New York State law, whether the action is

brought under New York's Blue Sky Law ("Martin Act") (see N.Y. Gen'l Bus. L. § 352-

c, CPLR § 214(2); setting forth a three year statute of limitations period), or under

common law fraud (see CPLR § 213(8)), this action is timely, as the Plaintiffs discovered

the fraud on or about December 10th, 2008, well within whatever statute of limitations period would be applicable hereto.

## III. PARTIES

16. Plaintiff JACK SALTZ is the Trustee of the named Plaintiffs SUSAN SALTZ CHARITABLE LEAD ANNUITY TRUST, and SUSAN SALTZ DESCENDANTS TRUST. Plaintiff SUSAN SALTZ is the lead and sole beneficiary of the named Plaintiff Trusts. The designated offices for the named Plaintiff Trusts are located at 150 East 52d Street, New York, NY 10022.

17. Plaintiff Trusts invested and lost approximately $4.2 million as a direct and indirect result of the actions of the named Defendants.[5]

18. Defendant FIRST FRONTIER, LP is a Delaware limited partnership created in December 1998. Its stated "objective is to seek optimal risk-adjusted consistent returns that are uncorrelated to the market while taking low risk".[6] It was to accomplish this by selecting an Investment Manager that would invest in a "basket of equity securities".

---

[5] Indeed, the amount of loss may well be over $5,000,000.00 based upon the refusal of the Beacon Defendants to provide a full accounting to the Plaintiffs, and their failure to distribute the approximately twenty-five percent of the fund that was not invested with BLMIS.

**N.B.**: Both named Trusts have filed Notices of claim with the Securities Investor Protection Corp. in the matter of *SIPC v. Bernard L. Madoff Investment Securities, LLC*, 08-10791, U.S. Bankruptcy Court, S.D.N.Y., seeking compensation under the Securities Investment Protection Act. These claims have been rejected by the Trustee, Irving Picard. Counsel, herein, on behalf of the Trusts, have filed a Notice of Objection to the Trustee's determination on or about December 22, 2009. This Objection has not been ruled upon by the Bankruptcy Court.

[6] Annexed hereto as **Exhibit A** is the Confidential Private Placement Memorandum for FIRST FRONTIER, LP, Subscription Documents to FIRST FRONTIER, LP, and the Limited Partnership Agreement for FIRST FRONTIER, LP.

19. The designated General Partner is Defendant FRONTIER CAPITAL MANAGEMENT, LLC.

20. The General Manager of FIRST FRONTIER, LP is Defendant MARK OSTROFF.

21. The Manager of FIRST FRONTIER, LP is Defendant FRONTIER ADVISORS CORP., a Delaware corporation. Defendant MARK OSTROFF is the President and sole director and shareholder of FRONTIER ADVISORS CORP.

22. The designated address, telephone and facsimile numbers for the Partnership, General Partner[7] and Manager, are:[8]

> 149 Fifth Avenue
> 15th Floor
> New York, NY 10010
> Telephone: 212-674-5500
> Facsimile: 212-674-5814

23. The designated Investment Manager was Bernard L. Madoff Investment Securities, LLC.

---

[7] According to the N.Y.S. Department of State Corporations Division, Defendant FRONTIER CAPITAL MANAGEMENT, LLC, effective June 14, 1999 (prior to the Plaintiffs' investment) changed its operating name to Waterstone Capital, LLC, however, it listed, for purposes of notice, the name and address designated in N. 7 *infra*.

[8] Notwithstanding this information contained in Partnership Memorandum, according to the filing by First Frontier, LP, with the N.Y.S. Department of State Corporations Division, the designated address is as follows:
> FIRST FRONTIER, L.P.
> ATTN: MARK OSTROFF
> 375 PARK AVENUE / SUITE 1404
> NEW YORK, NEW YORK, 10152

24. The Sole Manager and Principal Member of Defendant FRONTIER CAPITAL MANAGEMENT, LLC is Defendant MARK OSTROFF; and the only other Member of FRONTIER CAPITAL MANAGEMENT, LLC is the spouse of Defendant MARK OSTROFF, "FNU" OSTROFF.

25. Defendant ANCHIN, BLOCK & ANCHIN, LLP are the auditors for Defendant FIRST FRONTIER, LP, and provided annual and other financial reports for the limited partnership. It is the accountant and advisor for Defendant FIRST FRONTIER, LP. The firm is located at 1375 Broadway, New York, NY 10018, Tel. No. 212-840-3456, and, on its website (www.anchin.com) provides the following as its "Mission Statement",

> Our mission is to be our clients' Expert Partner, accomplishing this through creativity, innovation, insight, integrity and care. We are committed to connecting clients with experts who provide them industry partners who provide them with industry knowledge and innovative insights.

26. Plaintiffs' investment in First Frontier was decimated as a direct result of First Frontier's reckless and/or grossly negligent dereliction of their fiduciary duties, and the complete and utter failure of Defendant ANCHIN, BLOCK & ANCHIN, LLP, First Frontier's auditor, to perform adequate due diligence the existence of myriad red flags indicating that a high concentration of the Fund's assets were ultimately invested in Madoff related investments.

27. According to the Partnership Agreement and the Offering Memorandum, the required minimum capital contribution was one million dollars. Upon information and belief, immediately prior to the revelation of the fraud perpetrated by Madoff, the total assets in the fund were $13,464,380.72, and the approximate value of the Plaintiff's

investments was in excess of $5,200,000.00. Upon information and belief Plaintiffs' investments are worth near zero or zero at this time.

28. Defendants FIRST FRONTIER, LP, FRONTIER CAPITAL MANAGEMENT, LLC, MARK OSTROFF, "FNU" OSTROFF, and FRONTIER ADVISORS CORP. all have a responsibility to the Fund's investors to exercise good faith and fair dealing in all dealings affecting the fund.

29. Upon information and belief all (100%) of the invested funds with FIRST FRONTIER LP were given over to and invested with Defendant BEACON ASSOCIATES LLC I for investment purposes, notwithstanding the fact that this was never revealed to investors at the time of any subscription payments made as investments, such as the named Plaintiffs herein.

30. Defendant, BEACON ASSOCIATES LLC I, is a New York limited liability company formed under the laws of the State of New York on April 1, 2004 and managed by Defendant BEACON ASSOCIATES MANAGEMENT CORP. Its principal office is located at 123 Main Street, Suite 900, White Plains, NY 10601. Beginning on or about August 9, 2004, memberships in the Fund were offered via an Offering Memorandum ("Memberships"). The minimum capital contribution entitling an investor to access to the Fund was $500,000, subject to the right of Beacon Associates to modify the requirement. Prior to the revelation of the Madoff fraud, as of October 20,2008, the Net Asset Value of the Fund was approximately $560 million.

11

31. Defendant BEACON ASSOCIATES MANAGEMENT CORP. is a New York corporation, located at 123 Main Street, Suite 900, White Plains, NY 10601. Beacon Associates is the Managing Member of the Fund. Beacon Associates directs the business operations and affairs of the Fund, and makes allocation and reallocation decisions concerning the Fund's assets. Defendants JOEL DANZIGER and HARRIS MARKHOFF own (beneficially and of record) 100% of the issued and outstanding voting shares of Beacon Associates (constituting 1% of the outstanding stock of Beacon Associates). All of the non-voting common stock of Beacon Associates (consisting 99% of the total outstanding stock of Beacon Associates) is held by the immediate families of defendants DANZIGER and MARKHOFF. Beacon Associates has a responsibility to the Fund's investors to exercise good faith and fair dealing in all dealings affecting the fund.

32. Defendant JOEL DANZIGER, ESQ. ("Danziger") is the President and a Director of Defendant Beacon Associates. Mr. Danziger is a licensed attorney and a partner of the law firm of Danziger & Markhoff, LLP located at 123 Main Street, Suite 900, White Plains, NY 10601, the same address for Defendant BEACON ASSOCIATES MANAGE-MENT CORP. Upon information and belief Mr. Danziger resides in Bedford, NY.

33. Defendant HARRIS MARKHOFF, ESQ. ("Markhoff") is the Vice President, Secretary, Treasurer and Director of Beacon Associates. Mr. Markhoff is a licensed attorney and a partner of the law firm of Danziger & Markhoff LLP, located at 123 Main Street, Suite 900, White Plains, NY 10601, the same address for Defendant BEACON ASSOCIATES MANAGEMENT CORP. Mr. Markhoff resides in Pound Ridge, NY.

34. Defendant IVY ASSET MANAGEMENT CORPORATION ("Ivy Asset Management"), a Delaware corporation located at One Jericho Plaza, Jericho, New York 11753, is a wholly owned subsidiary of Defendant THE BANK OF NEW YORK MELLON CORPORATION. Ivy Asset Management is a registered Investment Advisor under the Investment Advisors Act of 1940 and a commodity trading advisor under the Commodity Exchange Act. Beacon Associates engaged Ivy Asset Management to provide it with advice regarding the selection and allocation of the Fund's assets among various investment managers and investment pools.

35. Defendant THE BANK OF NEW YORK MELLON CORPORATION ("BONY Mellon") is a Delaware corporation headquartered at One Wall Street, New York, NY 10286. According to its Form 10-K for the period ending September 30, 2009, it held Assets Under Management of $966 billion, and Assets Under Custody and Administration of $22.1 trillion. BONY Mellon is the parent company of Defendant Ivy Asset Management.

36. Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on Fund investors by their actions.

### III. GENERAL ALLEGATIONS

37. Plaintiff JACK SALTZ, by and on behalf of SUSAN SALTZ CHARITABLE LEAD ANNUITY TRUST, and SUSAN SALTZ DESCENDANTS TRUST, and SUSAN SALTZ do bring this action in the right and for the benefit of the named Trusts and the Trustee Beneficiary to seek redress for the injuries suffered, and to be suffered,

by the Fund as a direct result of the breach of fiduciary duties, abuse of control, gross mismanagement, negligence and fraud alleged herein.

38. Plaintiffs are investors, either directly or indirectly, in the Fund[9] and were investors of the Fund at all times relevant to the named Defendants wrongful course of conduct alleged herein.

39. Plaintiffs have not made any demand[10] upon the Managing Member, Defendant MARK OSTROFF, to bring an action on behalf of the Fund asserting the claims herein to recover damages for the injuries suffered by Fund, since such demand would have been a futile, wasteful and useless act, especially in light of the fact that said Defendant was himself grossly negligent in the operation and conduct of managing the Fund, and breached his fiduciary duty to the Fund and its investors.

40. Demand is excused because the unlawful acts and practices alleged herein cannot be defended by the Managing Member, and are not subject to the protection of any independent business judgment since it would undoubtedly be to the benefit of the Fund to recover the damages caused by all of the Defendants' individual and collective wrongdoing and to assert these derivative claims.

41. Demand is excused because the wrongs alleged herein constitute violations of the fiduciary duties owed by the Managing Member to the Members and the Fund. The Managing Member is subject to liability for breaching its fiduciary duties to the Fund by,

---

[9] See N. 4 *supra*

[10] See First Frontier, LP Subscription Agreement at Art. III, § 3.02; Art. XIV, § 14.01, **Exhibit A**, annexed hereto.

14

*inter alia,* causing the Fund's assets to be invested with Madoff or Madoff-related entities without any oversight or supervision, causing or permitting the reckless investing practices alleged herein, failing to adequately monitor the investment vehicles in which it placed the Fund's assets, failing to monitor those entities to which it entrusted the moneys of the Fund Members, failing to adequately supervise and improperly relying upon the ineffective and grossly negligent performance of the Funds accountants, and failing to detect, prevent, or halt the misstatements and omissions of material fact alleged herein.

42. The dramatic breakdowns and gaps in the Managing Member's internal controls were so widespread and systemic that the Managing Member faces substantial exposure to liability under the *Caremark* or similar doctrine for total abrogation of its duty of oversight.[11] The Managing Member either knew, or should reasonably have known that the Fund's assets, which had been entrusted to his care, were invested in a fund of funds and or feeder fund that were actually part of a massive Ponzi scheme, or otherwise generated purported, results that would have been impossible to achieve under Madoff's investment strategy, and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses to the Plaintiffs herein.

43. In addition, thereto, demand of the Managing Member is also excused because the Managing Member has ratified the egregious actions outlined herein, and the Managing

---

[11] "[O]nly a sustained or systematic failure of the board to exercise oversight -— such as an utter failure to attempt to assure a reasonable information and reporting system exists — will establish the lack of good faith that is a necessary condition to liability." *In re Caremark Int'l Derivative Litigation*, 698 A.2d 967, 971 (Dela. Chancery Ct. 1996). See also *In re IAC/InterActiveCorp Securities Litigation*, 478 F. Supp.2d 574, 605 (S.D.N.Y. 2007)

Member cannot be expected to prosecute claims against itself and persons or entities with whom it has extensive inter-related business, professional and personal entanglements,[12] if Plaintiffs demanded that it do so. The Managing Member, because of these relationships, has developed debilitating conflicts of interest that prevent it from taking the necessary and proper action on behalf of the Fund and its investors.

44. Demand is also excused because the Managing Member participated in, approved, or permitted the wrongs alleged herein, concealed or disguised those wrongs, or recklessly or negligently disregarded them, and therefore is not a disinterested party and lacks sufficient independence to exercise business judgment as alleged herein.

45. Given the size, scope, and blatancy of the wrongdoing and the misrepresentations alleged herein and above, the Managing Member either knew of the financial risks to the Fund's assets and the investors therein or he recklessly, negligently, and with misfeasance turned a blind eye to them. Such conduct is not protected by the business judgment rule and exposes the Managing Member to direct liability in this action.

46. The Fund has been directly and substantially injured by reason of the Managing Member's intentional breach and/or reckless disregard of its fiduciary duties to the Fund. Plaintiffs, as Members and Investors of the Fund, seek damages and other relief for the Fund, in an amount to be proven at trial; however, minimally in excess of four million dollars.

---

[12] As was mentioned *supra* (see ¶ 5), the other Principal Manager of Defendant First Frontier, LP, was Defendant Ostroff's spouse.

47. Defendant OSTROFF and his related entities, FIRST FRONTIER, LP,

FRONTIER ADVISORS CORP., and FRONTIER CAPITAL MANAGEMENT, LLC,

among others known and unknown, violated their individual and collective duties to the

Fund and its Investors to behave and conduct themselves in good faith, and to exercise

their judgment with due diligence and in recognition of their fiduciary responsibilities,

when they failed to conduct any due diligence regarding the use of Bernard L. Madoff

Investment Securities, LLC, as the fund's Investment Advisor.

## IV. SUBSTANTIVE ALLEGATIONS

48. During the period relevant hereto, Defendant FIRST FORNTIER, LP, offered

investment opportunities to qualified investors.

49. The "Confidential Private Placement Memorandum" was dated January 18, 1999,

and was offered by Defendant FIRST FRONTIER, LP, a Delaware Limited Partnership,

formed in December 1998.

50. As stated in the "Summary of the Offering",[13] the objective was to achieve a

"risk-adjusted consistent return, uncorrelated to the market while taking low risk."[14]  This

---

[13] A full copy of the Private Placement Memorandum, Partnership Agreement, and Subscription
Agreement, with Participation Forms, is annexed hereto as **Exhibit A**.

[14] It is the position of the Plaintiffs, herein, that the limited cautionary language in the Private
Placement Memorandum regarding risk is insufficient to accord the Defendants the benefit of the
"bespeaks caution doctrine." See generally P. Stolz Family Partnership, L.P. v. Daum, 355 F.3d
92, 96-97 (2d Cir. 2004); In re Britannia Bulk Holdings Securities Litigation, 2009 WL 3353045
at *8 (S.D.N.Y. 2009) (Cote, USDJ); Zirkin v. Quanta Capital Holdings Ltd., 2009 WL 185940
(S.D.N.Y. 2009) (Patterson, USDJ) ("bespeaks caution doctrine" applicable "due to the signifi-
cant cautionary language repeatedly made in the offering documents." Id. at *13. Emphasis
added.). And, any such affirmative defense cannot be successfully raised. See, e.g., Treeline
Investment Partners LP v. Koren, 2007 WL 1933860 at *6-*7 (S.D.N.Y. 2007) (Cote, USDJ).

was to be achieved by investing with the designated Investment Manager, who would

purchase a "basket of equity securities." While the Summary qualified its statement by

noting that "no assurance can be given that the objective will be achieved", nevertheless,

investors "will be able to obtain the benefit of having their investment managed by the

Investment Manager to an extent they may not otherwise be able to obtain." See

Summary of the Offering at p. A. See also Investment Strategies at p. 3.[15]

51. The Memorandum set forth the "General Partner" as being Defendant

FRONTIER CAPITAL MANAGEMENT, LLC", with Defendant MARK OSTROFF, as

the "sole manager and principal member of the General Partner." See Summary of the

Offering at p. A.

52. The Partnership's Manager was designated as Defendant FRONTIER

ADVISORS CORP. See Summary of the Offering at p. A.

53. The Investment Manager was designated as Bernard L. Madoff Investment

Securities, and its role was described as such:

> Bernard L. Madoff Investment Securities, which commenced business in
> 1960. The Investment Manager is a registered broker/dealer under the
> Securities Exchange Act of 1934, as amended (the "1934 Act"). The
> General Partner has delegated to the Investment Manager sole and
> complete authority to mange the assets of the Partnership.

---

[15] Although, among the Risk Factors in the Memorandum it was stated that the Investment
Manager (*i.e.*, BLMIS) was independent of the Partnership and the General Partner, investments
were to be made "pursuant to an agreement between the Partnership and the Investment Manager
which provides, among other things, guidelines by which the Investment Manager will trade for
the Partnership." And, furthermore, BLMIS was to be "bound by a written agreement to follow
specified trading strategies, . . ." See Risk Factors at p. 6, ¶ 5. Nevertheless, this did not relieve
the named Defendants from their fundamental fiduciary and common law and statutory duties.
Indeed, there is no evidence that the Defendants ever even set forth "guidelines" for BLMIS.

See Summary of the Offering at p. A.

54. A minimum investment of one million dollars ($1,000,000.00) was required to participate as a Limited Partner. See Summary of the Offering at p. B; Financial Summary of the Offering at p. 9.

55. The Manager (*i.e.*, Defendant FRONTIER ADVISORS CORP.) was entitled to a "Management Fee" calculated at one-eighth of one percent (0.125%) "of each Limited Partner's capital account balance at the beginning of each calendar quarter." See Summary of the Offering at p. B; Financial Summary of the Offering at p. 10.

56. The Memorandum provided that every Limited Partner was to received audited results each year, and a quarterly statement of that Limited Partner's account, with a letter from the General Partner "discussing the results of the Partnership for the quarter just ended", along with that Limited Partner's K-1 for income tax purposes. See Summary of the Offering at p. D.

57. The Memorandum was clear and unequivocal that "[s]ubstantially all of the Partnership's assets will be invested with the Investment Manager [*i.e.*, Bernard L. Madoff Investment Securities, LLC]." See Introduction at p. 1.

58. As with any planned investment, the designated Investment Strategy is the key issue for any investor. It should lay out the fundamentals of risk versus reward, how investments will be maintained, issues of timing, planned returns, expected growth, the riskiness of certain types of investments (ranging from investments in U.S. Treasury securities to complex financial derivatives), and the anticipated results of these

19

aforementioned investments. See generally *Shepard v. TCW/DW Term Trust 2000*, 938
F. Supp. 171, 175 (S.D.N.Y. 1996).

59. These planned investments were to be left, by the General Partner, to the sole and
exclusive discretion of the Investment Manager, *i.e.*, BLMIS. The stated plan was to
make a series of investments, and to hedge any losses by a clear strategy; a strategy that
minimized risk by spreading the investments over a "basket, which typically consists of
30-35 positions". Although certain risks were set forth, these were reduced due to the
Investment Manager's (*i.e.*, BLMIS) use of a so-called "collar", which was described as
follows: "The collar consists of options on the Index and serves as a hedge against the
Partnership's long portfolio." Finally, any additional funds will be invested in short-term
"A" rated liquid assets, such as money market funds, or U.S. Treasury obligations.

60. More completely, as set forth in the Memorandum,

A. Basket of Long S&P 100 (OEX) Index Securities Hedged by
Options on the Index. This investment strategy involves the purchase of a
basket of common stocks included in the Index and the simultaneous sale
of an Index call option and purchase of an Index put option. In each case,
the expiration date of the call option and the put option are identical. All
such transactions are undertaken on a hedged basis such that the basket of
common stocks purchased correlates significantly with the Index.
    *This strategy of selling a call against a long position increases income
while allowing appreciation to the strike price of the short call.
Additional income is earned through the collection of dividends from the
equity investments. Finally, the purchase of the put provides downside
protection for the underlying securities and is substantially funded by the
call premium.*
    Index options are commonly utilized in this trading methodology.
This strategy involves buying a group of equities which in the aggregate
highly correlates to the Index. Out-of-the-money Index call options are
sold, and out-of-the-money Index put options are purchased, against the
long basket of securities. The basket, which typically consists of 30-35
positions, is designed to closely track the performance of the Index

without having to purchase all one hundred (100) securities that comprise
the Index.

Among the risks involved in the strategy are tracking, market and
timing risks. The strategy to be employed by the Investment Manager
involves the establishment of a "collar". The collar consists of options on
the Index and serves as a hedge against the Partnership's long portfolio. It
is possible that the Partnership's portfolio of securities may not perfectly
track the performance of the Index. When the price of the Index is within
the collar (the difference between the strike prices of the long put and the
short call), the Partnership's portfolio is at the risk of the market, which
risk is limited to the size of the collar. The size of the collar is typically
around 5% to 10% of the value of the Index. A third risk is timing risk.
The Partnership's assets will not always be invested so the risk exists that
the timing of entry and exit into and out of the market may not be optimal.

B. Other. The General Partner may invest Partnership funds that are
not currently allocated to the Investment Manager in short-term U.S.
Government securities, money market accounts and/or other short-term
interest bearing instruments located at major financial institutions in the
United States. Any income earned from such investments will be
reinvested by the Partnership in accordance with the Partnership's
investment strategies.

See Investment Strategies at p. 2. Emphasis added.

61. The Memorandum, which was the key selling tool for the Defendants, relied upon

representations of the safety, security, and long-standing position of BLMIS as a safe,

reliable Investment Manager. In describing BLMIS, the Memorandum used the

following language,

> Bernard L. Madoff Investment Securities is registered as a broker/dealer
> under the 1934 Act. The General Partner has selected the Investment
> Manager to trade, invest and deal in securities and financial instruments
> for the Partnership. The Investment Manager is a market maker for
> dealers, banks and institutions. The Investment Manager has locations in
> New York and London, and makes markets in both listed and unlisted
> securities. The Investment Manager currently is a market maker for
> approximately 650 securities. The Investment Manager also trades in
> convertible bonds, convertible preferred stocks, warrants and listed equity
> and index options. The Investment Manager began operations in 1960 and
> has approximately 210 employees.

See Management at p. 4.

See also Conflicts of Interests at p. 13.

62. Whether, and to what extent the Defendants verified any of the above information, or did the due diligence required by any fiduciary, can only be speculated based upon the succeeding events. Indeed, as far back as 1992 the SEC had investigated the Avellino & Bienes Ponzi Scheme, and Madoff's connection thereto. Although there were "red flags" raised at this time, and this was a matter of public record, the Defendants had no qualms regarding the use of BLMIS for ALL of the investors' funds. Additional red flags and investigations by the SEC, all a matter of public record (including investigations in 2001, 2004, 2005, 2006) failed to either prevent the Defendants from using BLMIS, or terminating the relationship. See generally INVESTIGATION AND FAILURE OF THE SEC TO UNCOVER BERNARD MADOFF'S PONZI SCHEME (Office of Investigations, SEC Aug. 31, 2009) (SEC Report No. OIG-509).

63. Indeed, as the SEC noted,

> Numerous private entities conducted basic due diligence of Madoff's operations and, without regulatory authority to compel information, came to the conclusion that an investment with Madoff was simply too risky. These decisions were made based upon the same "red flags" in Madoff's operations that the SEC considered in its examinations and investigations, but ultimately dismissed.

See SEC Report No. OIG-509 at p. 424.[16]

---

[16] The Conclusion in the SEC Report continued as follows,

An explanation of why these private entities were able to understand and appreciate the suspicious aspects of Madoff's strategies and operations may be related to the differing approaches utilized by these private sector individuals conducting the analysis as compared to SEC examinations. The private entities generally described an "iterative" approach to due diligence, focusing on basic items, such as independence and transparency, while many faulted the SEC examinations for being too "checklist oriented." Through this "iterative" approach, the private entities were able to better understand the matters they were analyzing, such as the improbability of Madoff achieving his returns using his split-strike conversion strategy and the fact that Madoff could not be trading options in such high volumes without affecting the market or having counterparties that

64. As reported in the financial press, Robert Rosenkranz of Acorn Partners steered his clients away from Madoff finding that his consistent returns, in the face of fluctuating markets was impossible to explain. "Our due diligence, which got into both account statements of his customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity," Mr. Rosenkranz said. Simon Fludgate, head of operational due diligence for Aksia, another advisory firm that told clients not to invest with Mr. Madoff, said the secrecy of his strategy also raised red flags. And Mr. Madoff's stock holdings, which he disclosed each quarter with the Securities and Exchange Commission, appeared to be too small to support the size of the fund he claimed. Mr. Madoff's promoters sometimes tried to explain the discrepancy by explaining that he sold all his shares at the end of each quarter and put his holdings in cash. "There were no smoking guns, but too many things that didn't add up," Mr. Fludgate said.

(See http://investorshub.advfn.com/boards/read_msg.aspx?message_id=34166288)

65. Similarly, as *The New York Times* reported on December 17, 2008, routine due diligence on Madoff conducted by Societe Generale revealed serious irregularities:

> What [Societe Generale] found that March was hardly routine: Mr. Madoff's numbers simply did not add up. Societe Generale immediately put Bernard L. Madoff Investment Securities on its internal blacklist, forbidding its investment bank from doing business with him, and also strongly discouraged wealthy clients at its private bank from his investments.

---

could be located. In addition, *private entities who conducted due diligence appreciated the "red flags" that the SEC personnel dismissed because they had a greater experience and knowledge base in the industry than many SEC examiners have.* Emphasis added.

> The red flags at Mr. Madoff's firm were so obvious, said one banker with direct knowledge of the case, that Societe Generale "didn't hesitate. It was very strange."

Schwartz, N., "European Banks Tally Losses Linked to Fraud," *The New York Times*, December 17, 2008.

66. Furthermore, *Business Week* wrote about the Rye Select Board Market Prime Fund, which had invested all of its assets with BLMIS. *Business Week* reported that "managers of the Fort Worth pension fund, who first invested with Rye five years ago, started to rethink their investment in early 2008 after hiring Albourne Partners, a London due diligence firm, to assess their hedge fund portfolio. The Rye Fund raised red flags almost immediately. Albourne's managing director, Simon Ruddick, says the firm, which had long-standing concerns about Madoff's trading strategy and, consistent returns, had urged clients for nearly a decade to avoid affiliated funds such as Rye. In July, the pension's board voted unanimously to dump its Rye stake."

67. The Limited Partnership Agreement, in the Management section (Article III) set forth the manner in which the Partnership would be managed, and how investments would be made. More specifically, it was stated that "[i]t is the present intention of the General Partner to allocate the capital of the Partnership to one (1) independent investment manager (the 'Investment Manager') which is *currently engaged in split conversion hedged option (option basket) investment strategies*." Limited Partnership Agreement at § 3.01, 2. This stratagem of BLMIS had come under intense scrutiny in the past and, yet, the Defendants, nevertheless, saw no reason, whatsoever, to question its validity. In 2000, Neil Chelo, a colleague of Harry Markolpolos, the now-acknowledged whistle-blower on Madoff, who was then with Rampart Investment Management

Company, described the Madoff investment strategy — which the Defendants here were

relying upon — as follows,

> Chelo believed that Madoff's claimed returns were impossible to achieve
> using Madoff's claimed split-strike conversion strategy, stating:
>> I just don't know how you can produce these types of returns given
>> the strategy that was outlined in the marketing material. It was just,
>> in my mind, impossible ... Mainly the consistency because you'd
>> have to have basically like perfect market timing every month or
>> every year, depending on how he structures his split strike
>> conversions. It's like impossible. No one has that ability to forecast
>> market direction for such a long period and so consistently ...
> And if you did have that ability, you would do another strategy besides
> split strike conversion. You would do like a leveraged future strategy.
> You'd make way more money, and it just didn't make sense. It just didn't
> make sense, period.

SEC Report No. OIG-509 at p. 68.

68. The Plaintiff Trusts, herein, made its first investment with Frontier (*i.e.*, BLMIS)

in or about July 2005. Successive investments were made in 2006, 2007 and 2008. Well

before these investments were made serious questions had been raised regarding Madoff.

For example, A May 2001 article entitled "Madoff Tops Charts; Skeptics Ask How" in

*MAR/Hedge,* a semi-monthly newsletter reporting on the hedge fund industry, reported

that Madoff had reported positive returns for the last 11-plus years for Fairfield Sentry

and other feeder funds, but that current and former traders, other money managers, con-

sultants, quantitative analysts and fund-of-funds executives, many of whom were familiar

with the so-called split-strike conversion strategy used by Madoff, questioned the con-

sistency of the returns. These professionals noted that others using the strategy had no-

where near the same degree of success, and that Gateway, a publicly traded mutual fund,

which also used the strategy purported employed by Madoff, had experienced far greater

volatility and lower returns than Madoff. See SEC Report No. OIG-509 at pp. 74-75.

69. Unfortunately, none of the named Defendants, in the case at bar, came to the same conclusions regarding BLMIS, and this abject failure to be warned away by these "red flags" has resulted in the Plaintiffs losses herein.

70. Although the General Partner, in the Risk Factors section of the Memorandum attempted to limit its responsibility (see Risk Factors at pp. 6-8), at the same time the Partnership Agreement vested "exclusive authority to control the management of the day to day business operations and all other aspects of the Partnership" with Defendant FRONTIER CAPITAL MANGEMENT. See Summary of Certain Provisions of the Partnership Agreement at p. 18.

71. Significantly, while the Memorandum, Subscription Forms and Agreement, and the Limited Partnership Agreement all contained detailed listings and descriptions of the various parties involved (Frontier Capital Management, LLC, Mark Ostroff and his spouse, Frontier Advisors Corp., and Bernard L. Madoff Investment Securities, LLC) there was no mention of the fact that all of the funds invested with Frontier, *et al.*, were, in fact, invested with Defendants BEACON ASSOCIATE MANAGEMENT CORP., and BEACON ASSOCIATES LLC I. And, that through the aforementioned entities, investment decisions and strategies were made, and implemented, by Defendants IVY ASSET MANAGEMENT CORP. and THE BANK OF NEW YORK MELLON CORPORATION. See Summary of the Offering at p. A; Management at pp. 4-5.

72. The failure to make any reference to the non-Frontier parties was false and misleading and was a material omission of a significant factor that any and all investors were entitled to be apprised of.

73. While Defendants BEACON ASSOCIATE MANAGEMENT CORP., and BEACON ASSOCIATES LLC I had no direct privity with the Plaintiffs, nevertheless, they owed a fiduciary duty to the investors in Defendants Frontier. And, the same holds true for the Defendants IVY ASSET MANAGEMENT CORP. and THE BANK OF NEW YORK MELLON CORPORATION. These parties had entrusted to them the assets of Frontier, and were well aware (or certainly should have been) they owed fiduciary duties of good faith, fair dealing, and due care.

74. They knew, or, in the exercise of due care in discharging their fiduciary duties, were reckless in not knowing that Madoff was engaged in a massive Ponzi scheme, or, at a minimum, were reporting results that could neither be verified nor explained. Nonetheless, they knowingly and willfully invested Frontier's assets in BLMIS or other Madoff-managed investment vehicles. They had a fiduciary obligation to protect the assets of the Fund, which they utterly failed to fulfill.

75. Despite Defendants Frontiers, *et al.*, egregious conduct in failing to properly conduct due diligence and failing to ensure that the investors' assets were invested in accord with the Offering Memorandum instead of in a Ponzi scheme orchestrated by Madoff, Frontier, Beacon Associates, and Ivy Asset Management, and their related and affiliated entities, named and un-named herein, nevertheless, Frontier was collecting a Managing Member fee from the value of each Member's Capital Account at an annual rate of one-eighth of one percent (.0125%).

76. While the Plaintiffs, and other investors with Frontier, *et al.*, did receive their K-1 Statements, annually for income tax purposes, and did receive annual and quarterly

financial statements, nevertheless, Defendant ANCHIN, BLOCK & ANCHIN, LLP, the

Fund's auditor, failed to perform its work in a manner consistent with, and according to

the standards of the accounting and auditing profession as required by Generally

Accepted Auditing Standards ("GAAS").

77. Defendant ANCHIN, BLOCK & ANCHIN, LLP either knew of or recklessly

disregarded: (a) the concentration of the Fund's investments in a single third party

investment manager (BLMIS); (b) the materially heightened risk to the Fund's assets

from such reliance on Madoff, particularly given the lack of transparency of Madoff's

operations; (c) the abnormally high and stable positive investment results reportedly

obtained by Madoff; and (d) the inconsistency between BLMIS's publicly available

financial information concerning its assets and the purported amounts that Madoff

managed for clients such as the Fund.

78. As Defendant ANCHIN, BLOCK & ANCHIN, LLP failed to perform as

discussed above, and signally either failed to be aware of the numerous "red flags" of the

Madoff operations, or recklessly disregarded those flags in the pursuit of fees and clients,

its behavior was grossly negligent, and a clear and unmistakable violation of numerous

Rules and Sections of the GAAS. For example,

    A. Defendant ANCHIN, BLOCK & ANCHIN, LLP failed to "exercise due

       professional care in the performance of the audit and the preparation of the

       report" (SAS 1, AU § 230).[17]

---

[17] Significantly, Section 230.05 states the following: "An auditor should possess 'the degree of skill commonly possessed' by other auditors and should exercise it with 'reasonable care and diligence' (that is, with due professional care)." As was noted *supra*, many fund managers refused to invest with BLMIS finding numerous "red flags"; those parties, while not Defendant

B. Defendant ANCHIN, BLOCK & ANCHIN, LLP clearly failed to adequately plan the audit by "developing an overall audit strategy for the expected conduct, organization, and staffing of the audit." (SAS 108, AU § 311). This standard requires the dedication and utilization of adequate and competent resources commensurate with the size and complexity of the audit. § 311.02.

C. Defendant ANCHIN, BLOCK & ANCHIN, LLP clearly and unmistakably failed in its "responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." (SAS 99, AU § 316.01). Defendant ANCHIN was still issuing its audits and failing to apprise its clients, as late as September 2008, barely three months before the Madoff fraud was exposed, and even after the SEC Report had detailed numerous instances of serious questionable activity and performance for BLMIS.

D. Defendant ANCHIN, BLOCK & ANCHIN, LLP failed to accumulate the required evidence from BLMIS to substantiate the performance of the Funds (SAS 106, AU § 326.01). This GAAS Standard mandates that "all the information used by the auditor in arriving at the conclusions on which the audit opinion is based and includes the information contained in the accounting records underlying the financial statements and other information." *Id.* at § 326.02. It further defines "accounting records" as "the records of initial entries and supporting records, such as checks and records of electronic fund transfers; invoices; contracts; the general and subsidiary

---

ANCHIN, unfortunately for the Plaintiffs herein, possessing the degree of skill referenced in this section