UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

JACK SALTZ, et al.

                             Plaintiffs,

        v.

FIRST FRONTIER, LP, et al.

                             Defendants.

**OPINION**
**& ORDER**


10 Civ. 964 (LBS)

SAND, J.

      Plaintiffs in this case are investors in First Frontier, LP ("FF Fund"), a "sub-feeder fund"

that indirectly invested in Bernard L. Madoff Securities LLC ("BMIS").[1]  Plaintiffs assert claims

against Defendants associated with the FF Fund, its auditors, the "feeder fund" in which the FF

Fund invested, and John Does 1–100.[2]  Defendants have moved to dismiss the First Amended

Complaint ("FAC") in its entirety.  For the following reasons, the motions are granted.

**I.  Background**

      For the purposes of this proceeding, we take these facts alleged by Plaintiffs to be true.

The FF Fund is a Delaware limited partnership.  Defendant Frontier Capital Management, LLC

---

[1] Madoff was a prominent and respected member of the investing community, who used his investment company BMIS to engage in a multi-billion dollar Ponzi scheme.  Madoff deceived countless investors and professionals, as well as his primary regulators, the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA").  On December 11, 2008, Madoff was arrested by federal authorities.  Madoff, along with BMIS's accountant and other associates, pleaded guilty to securities fraud and related offenses arising out of the Ponzi scheme.

[2] Several other actions before this Court and other courts relate to losses sustained by sub-feeder and feeder funds that invested with Madoff.  *See Wolf Living Trust v. FM Multi-Strategy Inv. Fund, L.P.*, 09 Civ. 1540 (LBS), 2010 WL 4457322 (S.D.N.Y. Nov. 2, 2010); *Newman v. Family Mgmt. Corp.*, No. 08 Civ. 11215 (LBS), 2010 WL 4118083 (S.D.N.Y. Oct. 20, 2010) (brought on behalf of investors in FM Low Volatility Fund, also managed by FMC); *In re Beacon Assocs. Litig.*, No. 09 Civ. 777 (LBS), 2010 WL 3895582 (S.D.N.Y. Oct. 5, 2010) (brought on behalf of investors in the Beacon Fund).

("Frontier Capital") is the General Partner of the FF Fund, and Frontier Advisors Corporation ("Frontier Advisors") is the FF Fund's Manager.  Defendant Mark Ostroff is the General Manger of the FF Fund, President of Frontier Advisors, and Principal Member and Sole Manager of Frontier Capital.  His spouse, "FNU" Ostroff, is the only other Member of Frontier Capital. These persons and entities are collectively referred to as the "FF Defendants."

Plaintiff Jack Saltz is the Trustee of the named Plaintiffs Susan Saltz Charitable Lead Annuity Trust, and Susan Saltz Descendants Trust.  Plaintiffs invested in the FF Fund beginning in or about July 2005 and continued to make investments in subsequent years.  They remained investors in the FF Fund at all times relevant to the Defendants' alleged wrongful course of conduct.

Interests in the FF Fund were offered through a Confidential Private Placement Memorandum dated January 18, 1999.  FAC Ex. A ("FF PPM").  The FF Fund was to invest substantially all of the Fund's assets with a designated independent Investment Manager, identified as BMIS.  Investments were to be made "pursuant to an agreement between the Partnership and the Investment Manager which provides, among other things, guidelines by which the Investment Manager will trade for the Partnership."  FF PPM at 6.  According to the offering materials, the General Partner "delegated to the Investment Manager sole and complete authority to manage the assets of the Partnership."  FF PPM at A.  Thus, it warned, "while the Investment Manager is bound by a written agreement to follow specified trading strategies, it is possible that the Investment Manager could violate the agreement, which violation could result in a riskier approach that could lead to a loss of all or part of the Partnership's investment."  FF PPM at 6.  Frontier Advisors received a 0.125% management fee at the end of each quarter.  FF PPM at B.

2

Although BMIS is identified in the PPM as the Investment Manager, the FF Fund did not deal directly with BMIS but rather invested in the feeder fund Beacon Associates LLC I ("Beacon Fund"), a New York limited liability company.  Through Beacon, "investment decisions and strategies were made, and implemented" by Defendants Ivy Asset Management Corporation ("Ivy") and Bank of New York Mellon Corporation ("BONY").  FAC ¶ 75. Plaintiffs allege they were never informed of Beacon's or Ivy's involvement, although their existence was disclosed in the annual audited report.  *See* Brody Decl., Ex. E at 9–10.

Plaintiffs allege they invested and lost approximately $4.2 million as a result of the FF Fund's investments in Madoff.[3]  Following the revelations of Madoff's fraud, Plaintiffs received multiple communications from Defendant Mark Ostroff regarding the status of distributions from the Beacon Fund and explaining that they were expected in mid to late 2009.  Plaintiffs have not yet received distributions.[4]

### a. The Beacon Defendants

The Beacon Fund was a "feeder fund" in which the FF Fund's assets were invested before they were transferred to Madoff as part of a larger pool.  Defendant Beacon Associates Management Corp ("BAMC"), a New York corporation, directs the business operations and affairs of the Beacon Fund, and makes allocation and reallocation decisions concerning the Fund's assets.  BAMC is wholly owned by Defendants Joel Danzinger and Harris Markhoff and

---

[3] Plaintiffs provide figures "[u]pon information and belief" that immediately prior to the revelation of the fraud perpetrated by Madoff, the total assets in the fund were $13,464,380.72, and the approximate value of the Plaintiff's investments was in excess of $5.2 million but that their investments are worth "near zero or zero at this time."

[4] The Beacon Fund's liquidation is the subject of another action before this Court and Magistrate Judge Peck.  *See Beacon Assocs. Mgmt. Corp. v. Beacon Assocs. LLC I*, No. 09 Civ. 6910 (AJP), 2010 WL 2947076 (S.D.N.Y. July 27, 2010); *Rounds v. Beacon Assocs. Mgmt. Corp.*, No. 09 Civ. 6910 (LBS), 2009 WL 4857622 (S.D.N.Y. Dec. 16, 2009).

their immediate families.  Joel Danzinger is the President and a Director of BAMC, and Harris

Markhoff is the Vice President, Secretary, Treasurer, and a Director.

On or about August 9, 2004, memberships in the Fund were offered via an Offering

Memorandum ("OM").  Prior to the revelation of the Madoff fraud, as of October 20, 2008, the

Net Asset Value of the Fund was approximately $560 million.  On or about December 18, 2008,

investors in the FF Fund received a letter from Defendant BAMC informing the affected parties

of the Madoff fraud and the intention to liquidate the fund.  *See* FAC Ex. B.

### b.  Ivy Defendants

Defendant Ivy is a limited liability company and wholly-owned subsidiary of Defendant

BONY.  Ivy is a registered Investment Advisor under the Investment Advisors Act of 1940 and a

commodity trading advisor under the Commodity Exchange Act.  BAMC engaged Ivy, who

served as the Beacon Fund's link to Madoff, to provide it with advice regarding the selection and

allocation of the Beacon Fund's assets among investment managers and investment pools.

### c.  Auditor Defendants

The FF Defendants utilized the services of several accounting firms, including Defendant

Anchin, Block & Anchin, LLP ("Anchin") and Lazar Levine & Felix LLP, now merged with

Defendant ParenteBeard LLC ("ParenteBeard" and together with Anchin the "Auditor

Defendants").[5]  Plaintiffs allege that Anchin was an auditor for the FF Fund during the period at

issue and "provided, among other things, annual reports and 10-Ks to the First Frontier clients,

including the Plaitniffs."  FAC ¶ 6.  ParenteBeard was also retained by the FF Defendants to

provide annual financial statements and auditors' reports to clients, including Plaintiffs during

the relevant period.

---

[5] For ease of reference, Lazar Levine & Felix is referred to herein as ParenteBeard notwithstanding that it was not
known as such at the time of the alleged misdeeds.

### d.  John Doe Defendants

In addition to the Defendants named in the FAC, Plaintiffs assert claims against John Does 1–100, who "were in positions of ownership and/or control over the Fund, including the members of the Managing Member's Advisory Board.  By virtue of their high level positions, participation in and/or awareness of the Fund's investments, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Fund." FAC ¶ 108.

### e.  Alleged Red flags

Plaintiffs identify a number of "red flags" that were publicly available prior to the official announcement of Madoff's fraud.  The alleged red flags include, among others, Madoff's consistent investment returns and the secrecy of his strategy—both written about in industry publications at the time—that Madoff's stock holdings appeared to be too small to support the size of fund he claimed, and Madoff's unusual fee structure, as well as the following: "(a) Madoff generally reported that he bought near daily lows and sold near highs with uncanny consistency; (b) Madoff always claimed to be fully invested in treasury bills at the end of each quarter, which was inconsistent with his purported strategy as it would require him to liquidate his positions even under favorable conditions; (c) a firm the size of [BMIS] was audited by an unknown two man operation, instead of one of the major accounting firms; and (d) Madoff's reported results were inconsistent with the split-strike strategy, which might reduce volatility but could not produce gains in a declining stock market."  Pl. Opp. at 20; *see also* FAC ¶¶ 67–70. Plaintiffs note that a few other investors decided that investing with Madoff was too risky in light of the red flags, but Plaintiffs do not allege the Defendants were in contact with these investors or were otherwise aware of their decision not to invest.

5

## II. Standard of Review

On a motion to dismiss, a court reviewing a complaint will consider all material factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Lee v. Bankers Trust Co.*, 166 F.3d 540, 543 (2d Cir. 1999). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 93 (2d Cir. 2007) (internal quotation marks omitted). Ultimately, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). "[A] simple declaration that defendant's conduct violated the ultimate legal standard at issue . . . does not suffice." *Gregory v. Daly*, 243 F.3d 687, 692 (2d Cir. 2001).

Allegations of fraud must meet the heightened pleading standard of Rule 9(b), which requires that the plaintiff "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). "[W]hile Rule 9(b) permits scienter to be demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. An ample factual basis must be supplied to support the charges." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (internal citations omitted).

On a motion to dismiss, a court is not limited to the four corners of the complaint, but may also consider "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in

plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

### III. Discussion

#### a. Federal Securities Fraud Claims against the FF Defendants

Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b), makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may proscribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78(j). The SEC rule implementing the statute, Rule 10b-5, prohibits "mak[ing] any untrue statement of a material fact or omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim, a plaintiff must allege facts sufficient to show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

Section 10(b) claims are subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 77z-1, 78u-4. *See ATSI Commc'ns*, 493 F.3d at 99. Under the PSLRA, the Complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," namely, with intent "to deceive, manipulate or defraud." 15 U.S.C. §§ 78u-4(b)(1), (2). "Therefore, '[w]hile we normally draw reasonable inferences in the non-

7

movant's favor on a motion to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)).  Plaintiffs allege misrepresentations regarding the FF Fund's investment objectives and strategies, due diligence performed on investment managers, and the performance of the Partnership.  The FF Defendants move to dismiss Plaintiffs' claims on the basis that they do not adequately plead scienter, an actionable misrepresentation, reasonable reliance, and loss causation.

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (internal quotation marks and citation omitted).  "[T]he facts alleged must support an inference of an intent to defraud the plaintiffs rather than some other group." *ECA*, 553 F.3d at 197 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 140–41 (2d Cir. 2001)).  "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  The Court must consider "not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged.  An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct." *Id*.

Scienter can be shown by (1) demonstrating that a defendant had the motive and opportunity to commit fraud, or (2) providing evidence of conscious recklessness. *See South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108–09 (2d Cir. 2009).  Conscious recklessness is a "state of mind approximating actual intent, and not merely a heightened form of

negligence." *Id*. at 109 (quoting *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000)). Recklessness is "at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak,* 216 F.3d at 308.

Plaintiffs allege scienter based on both conscious recklessness and motive and opportunity to commit fraud. First, as to recklessness, Plaintiffs allege the FF Defendants knew or should have known of "extremely obvious red flags" that "they had an obligation to investigate, but did not." Pl. Opp. 25. Plaintiffs contend Defendants must have known of the red flags because they "were available to the Massachusetts regulator, and other professionals, [and] were equally available to each of the Defendants." Pl. Opp. 26. Furthermore, they assert, "[b]ecause of the relationship between the First Frontier Defendants and the Beacon Defendants, [the red flags] were also known to the First Frontier Defendants."[6] Pl. Opp. 27. This theory has been routinely rejected where, as here, Plaintiffs offer no evidence Defendants were aware of most red flags, and those of which Defendants were aware, were not so serious as to infer intent to defraud. *See Stephenson v. Citco Grp. Ltd*., 700 F. Supp. 2d 599, 623–24 (S.D.N.Y. 2010) (finding following red flags not so obvious as to infer knowledge: "BMIS' transactions were at variance with market evidence; . . . BMIS did not permit access to its computers, and many of its reported trades could not have actually taken place at the prices reported; . . . BMIS' independent auditor, Friehling and Horowitz, was small, not well known, and not properly certified"); *Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 0118 (VM), 2010 WL 3341636, at *65 (S.D.N.Y. Aug. 18, 2010) (rejecting following red flags, if known to auditor, as indicative of intent to deceive:

---

[6] Plaintiffs also focus on the carveout in the Beacon-Ivy Investment Advisory Agreements that excluded Madoff from Ivy's monitoring and evaluation function. Yet they do not allege the FF Defendants were aware of this carveout, the implications of which are addressed in related litigation. *See In re Beacon Assocs. Litig.*, 2010 WL 3895582, at *34.

9

"Madoff did not provide electronic confirmations to the Funds that he managed, and instead gave them delayed, paper confirmation of supposed trades[;] . . . Madoff purport[ed] to turn consistent investment returns during good times and bad times in the market[;] . . . All of the Funds' assets were managed by Madoff, who acted as investment advisor, broker-dealer, and custodian of those assets—a highly unusual arrangement with no checks and balances"); *In re Tremont Secs. Law, State Law and Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010) (finding no scienter where "plaintiffs do not assert that the [defendants] knew that Madoff's returns could not be replicated by others, and plaintiffs do not claim that investors who elected not to deal with Madoff informed the [defendants] of their decisions").

For twenty years, Madoff operated this fraud without being discovered and with only a handful of investors withdrawing their funds as a result of their suspicions.  An inference of scienter based on publicly available red flags is simply not as cogent and compelling as the opposing inference of nonfraudulent intent.  *See S.E.C. v. Cohmad Sec. Corp.*, No. 09 Civ. 5680 (LLS), 2010 WL 363844, at *2 (S.D.N.Y. Feb. 2, 2010) (rejecting scienter allegations because "the complaint supports the reasonable inference that Madoff fooled the defendants as he did individual investors, financial institutions, and regulators").

Second, Plaintiffs do not sufficiently plead motive and opportunity to defraud.  "In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must allege that [defendant] or its officers 'benefited in some concrete and personal way from the purported fraud.'"  *ECA*, 553 F.3d at 197 (quoting *Novak,* 216 F.3d at 307–08).  Plaintiffs allege the FF Defendants benefited because they received quarterly fees of .0125% of the FF Fund's net asset value.  However, Plaintiffs fail to allege facts that demonstrate these fees are exorbitant or at all in excess of the industry standard.  In fact, the fees were fully disclosed in the

10

FF Fund offering materials.  *See* FF PPM at B.  The desire to maintain high compensation in

such circumstances does not constitute motive to defraud.  *Acito v. IMCERA Grp., Inc.*, 47 F.3d

47, 54 (2d Cir. 1995) (where executive compensation is dependent upon stock value, motive to

keep stock price high does not give rise to strong inference of scienter); *Edison Fund v. Cogent

Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) ("The desire to earn

management fees is a motive generally possessed by hedge fund managers, and as such, does not

suffice to allege a "concrete and personal benefit" resulting from fraud."); *Stephenson*, 700 F.

Supp. 2d at 620–21 (finding economic interest in retaining clients not probative of motive to

ignore Madoff's fraud).

Accordingly, the FF Defendants' motion to dismiss Count I is granted.[7]  Because section

20(a) liability requires "a primary violation" under section 10(b), the section 20(a) claims against

the FF Defendants (Count II) are also dismissed.  *See ATSI Commc'ns*, 493 F.3d at 108 (holding

section 20(a) requires (1) "a primary violation by the controlled person," (2) "control of the

primary violator by the targeted defendant," and (3) that the "controlling person was in some

meaningful sense a culpable participant in the fraud perpetrated" (internal quotation marks

omitted)).

### b.  Federal Securities Fraud Claims against the Ivy Defendants

Secondary actors, such as accountants, lawyers, and consultants, may be held liable as

primary violators of 10b-5 "if all the requirements for primary liability are met, including 'a

material misstatement (or omission) on which a purchaser or seller of securities relies.'"  *Wright

v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998) (quoting *Cent. Bank of Denver, N.A. v. First

---

[7] Defendants raise serious concerns as to whether the Plaintiffs could successfully plead that Defendants made material misrepresentations given that Plaintiffs apparently knew and intended that virtually all of their assets were invested in Madoff.  However, given Plaintiffs' failure to adequately plead scienter, the Court need not consider this and other challenges to the 10b-5 claims against the FF Defendants.

*Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994)); *see also Pacific Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 148 n.1 (2d Cir. 2010) ("*PIMCO*") (identifying "parties who are not employed by the issuing firm whose securities are the subject of the allegations of fraud" as "secondary actors."). "There is no requirement that the alleged violator directly communicate misrepresentations to [investors] for primary liability to attach." *Anixter*, 77 F.3d at 1226. However, aiding in or even encouraging a violation, without an accompanying misstatement or omission, is not sufficient. *Cent. Bank of Denver*, 511 U.S. at 176–77 (holding Section 10(b) does not impose liability for aiding and abetting securities fraud); *Vosgerichian v. Commodore Int'l*, 862 F. Supp. 1371, 1378 (E.D. Pa. 1994) (allegations that accountant "advised" and "guid[ed]" client in making allegedly fraudulent misrepresentations insufficient). Moreover, "a secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination. Such a holding would circumvent the reliance requirements of the Act, as '[r]eliance only on representations made by others cannot itself form the basis of liability.'" *Wright*, 152 F.3d at 175 (quoting *Anixter*, 77 F.3d at 1225). "Thus, the misrepresentation must be attributed to that specific actor at the time of public dissemination, that is, in advance of the investment decision." *Id*.; *PIMCO*, 603 F.3d at 148 ("a secondary actor can be held liable in a private damages action brought pursuant to Rule 10b-5 only for false statements attributed to the secondary actor at the time of dissemination."). In reaffirming the "bright-line" attribution rule, the Court of Appeals for the Second Circuit recently held that "[t]he mere identification of a secondary actor as being involved in a transaction, or the public's understanding that a secondary actor 'is at work behind the scenes' are alone insufficient" to hold a secondary actor liable under Rule 10b-5. *Id.* at 155 (quoting *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 155 (2d Cir. 2007)). "To be cognizable, a plaintiff's claim against a

secondary actor must be based on that actor's own 'articulated statement,' or on statements made by another that have been explicitly adopted by the secondary actor." *Id*. at 155.

Plaintiffs here do not plead any misstatement attributable to the Ivy Defendants.  Of the three types of misrepresentations Plaintiffs focus on in their Opposition, the only mention of Ivy is with regard to "promised due diligence."  Pl. Opp. 19.  But nowhere do Plaintiffs identify when or to whom Ivy promised to perform due diligence, or the extent of diligence they were to perform.  Plaintiffs do not allege that the FF offering materials attributed their assessment of the Partnerships' investment objectives, strategies, and diversification to Ivy.  Nor do they allege that statements were made to or relied on by First Frontier on an agency theory.[8]

To the extent Plaintiffs base their claim on omissions rather than misstatements, Plaintiffs point to no material fact that Ivy had a duty to disclose but did not disclose.  While Plaintiffs argue a duty existed because Ivy "made, and implemented" investment decisions and strategies, FAC ¶ 75, they do not allege that they, or the FF Defendants acting on their behalf, had any agreement with Ivy.  Nor do they allege any prior disclosures to either party that would result in a duty to update or correct.  *See* 17 C.F.R. § 240.10b-5(b) (prohibiting "[omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading").  Only Beacon is alleged to have had any communication with Ivy.

Plaintiffs were unaware that Ivy played any role at all at the time they made their investment decisions, and they do not allege the parties who had such knowledge, the Beacon and FF Defendants, relied on any misrepresentations or omissions.  Plaintiffs do not sufficiently allege a violation under 10b-5; thus, Ivy's motion to dismiss is granted.  Because section 20(a)

---

[8] See *In re Beacon*, 2010 WL 3895582, at *15–16.  In fact, First Frontier is within the class of plaintiffs represented in *In re Beacon*, which is proceeding against both the Beacon and Ivy defendants.

liability requires a primary violation under section 10(b), the section 20(a) claims against the Ivy Defendants are also dismissed.

### c. Federal Securities Fraud Claims against the Beacon Defendants

Beacon argues that Plaintiffs do not identify any misrepresentations or omissions attributable to the Beacon Defendants and that they do not adequately allege scienter and reliance. Plaintiffs allege Beacon made misstatements regarding the funds' strategies, due diligence processes, and performance. The alleged source of these statements is the Beacon OM, which Plaintiffs acknowledge they did not receive and have not read. Nor do Plaintiffs allege any misstatements made to the FF Fund. *See In re Beacon Assocs. Litig.*, 2010 WL 3895582, at *15–16 (permitting claims of misstatements made to plaintiffs' agent to survive motion to dismiss). Rather they seem to rely on the mistaken assumption that statements made by the FF Defendants in the FF PPM—the only relevant communication received by the Plaintiffs—are attributable to all Defendants involved in the overall transaction. *See In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1293 (S.D.N.Y. 1996) ("The complaint may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which it individually stands charged."); *Manela v. Gottlieb*, 784 F.Supp. 84, 87–88 (S.D.N.Y. 1992) (dismissing complaint where "many of the allegations are made against multiple defendants lumped together and fail to distinguish among them").

Similarly, Plaintiffs do not allege any material fact that Beacon had a duty to disclose but did not. Nor do they allege any prior disclosures to either the Plaintiffs or the FF Fund that would result in a duty to update or correct. Plaintiffs admit that the Beacon Defendants "had no direct privity with the Plaintiffs," FAC ¶ 77, and that they were unaware Beacon played any role

at all at the time they made their investment decisions.  Rather, the Beacon Defendants

communicated only with the FF Fund of which Plaintiffs were members, and Plaintiffs do not

allege that the FF Defendants relied on any omission on the part of the Beacon Defendants.[9]

Because Plaintiffs do not plead with particularity any misstatements or omissions by the

Beacon Defendants on which they relied, Beacon's motion to dismiss is granted in its entirety.

Because section 20(a) liability requires "a primary violation" under section 10(b), the section

20(a) claims against the Beacon Defendants are also dismissed.

### d.   Remaining Fraud and Gross Negligence Claims against the FF Defendants

Plaintiffs allege gross negligence (Count VIII) and two common law fraud claims against

the FF Defendants, common law fraud (Count III) and fraudulent concealment (Count IV).[10]

Both common law fraud and fraudulent concealment require the Plaintiff to plead scienter.

*Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (holding New York fraud claim

requires "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to

be false; (3) which the defendant made with the intent of inducing reliance; (4) upon which the

plaintiff reasonably relied; and (5) which caused injury to the plaintiff") (citing *Lama Holding*

*Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421 (1996)); *TVT Records v. Island Def Jam Music*

*Grp.*, 412 F.3d 82, 90–91 (2d Cir. 2005) (holding fraudulent concealment requires "proof of: (1)

failure to discharge a duty to disclose; (2) an intention to defraud, or scienter; (3) reliance; and

(4) damages") (citing *Brass v. Am. Film Techs.*, 987 F.2d at 152.  The scienter element for these

---

[9] Such a claim is however pending on behalf of funds such as the FF Fund that invested in Beacon in the related
case, *In re Beacon Assocs. Litig.*
[10] Plaintiffs also plead the tort of constructive fraud (Count V).  Because constructive fraud does not include an
element of scienter, it is discussed alongside the claim for negligent misrepresentation *infra*.  *See Burrell v. State*
*Farm & Cas. Co.*, 226 F. Supp. 2d 427, 438 (S.D.N.Y. 2002) (plaintiff must establish same elements as claim for
fraud, "except that the element of scienter is replaced by a fiduciary or confidential relationship between the
parties"); *Klembczcyk v. Di Nardo*, 265 A.D.2d 934, 935 (N.Y. App. Div. 1999) (same).

claims is essentially the same as that under federal securities laws. *See Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings*, No. 09 Civ. 3708 (TPG), 2010 WL 1257567, *6–7 (S.D.N.Y. March 31, 2010) ("[T]he elements of Section 10(b) claims are essentially the same as those for common law fraud in New York.") (citing *Fezzani v. Bear, Stearns & Co.*, 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008). For the reasons cited *supra*, Plaintiffs do not adequately plead scienter.

Gross negligence "is conduct that evinces reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 81 N.Y.2d 821, 823–24 (N.Y. 1993). It "represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 454 (2d Cir. 2009) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.1978)). That Plaintiffs allegations regarding Defendants' failure to discover or act on red flags are insufficient to establish such an "extreme departure" has already been discussed *supra*. Although gross negligence does not require the heightened pleading requirements of Rule 9(b), here, the allegations regarding the failure to discover Madoff's fraud are nonetheless insufficient as a matter of law. The FF Defendants' motion to dismiss Counts III, IV, and VIII is granted.

### e. Remaining Fraud & Gross Negligence Claims against the Auditor Defendants

"For recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that . . . approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company." *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (internal quotation marks omitted). Plaintiff must allege "the accounting practices were so

16

deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or

investigate the doubtful, or that the accounting judgments which were made were such that no

reasonable accountant would have made the same decisions if confronted with the same facts."

*In re IMAX Secs. Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008).

 Plaintiffs allege that the Auditor Defendants "aided and abetted" the fund defendants by

approving "inaccurate and false financial performance statements" and that they "knew, or

should have known, but for their conscious avoidance, that the statements far overstated the

value of each investor's account because they included the value of worthless BLMIS holdings."

Pl. Opp. at 21.  Plaintiffs also allege that "each of the Accounting Defendants indisputably knew

[of] some red flags, and, but for their extreme recklessness, (i.e., selfish disregard for their clients

interests and money) should have known of red flags, but took no action to disclose the red

flags," or "failed to check information they had a duty to monitor."  Pl. Opp. at 25–26 (internal

citations omitted).  Specifically, they allege that the Auditor Defendants disregarded "(a) the

concentration of the Fund's investments in a single third party investment manager (BLMIS); (b)

the materially heightened risk to the Fund's assets from such reliance on Madoff, particularly

given the lack of transparency of Madoff's operations; (c) the abnormally high and stable

positive investment results reportedly obtained by Madoff; and (d) the inconsistency between

BLMIS's publicly available financial information concerning its assets and the purported

amounts that Madoff managed for clients such as the Fund."  FAC ¶ 81.  These and other actions

allegedly violate the Generally Accepted Auditing Standards ("GAAS").  Defendants assert that

these allegations are insufficient to support finding scienter, reliance, and loss causation.

 While "[a]llegations of . . . GAAS violations alone are insufficient" to plead scienter,

*Whalen v. Hibernia Foods PLC*, No. 04 Civ. 3182 (HB), 2005 WL 1799370, at *3 (S.D.N.Y.

Aug. 1, 2005), "[a]llegations [an auditor ignored] 'red flags,' when coupled with allegations of . . . GAAS violations, are sufficient to support a strong inference of scienter." *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004). However, "only those red flags that [the auditor] is alleged to have known of, or that are so obvious that [the auditor] must have known of them, can support an inference of intent." *Stephenson*, 700 F. Supp. 2d at 623. "[M]erely alleging that the auditor had access to the information by which it could have discovered the fraud is not sufficient." *In re IMAX Secs. Litig.*, 587 F. Supp. 2d at 484.

As to the red flags of which the Auditor Defendants were allegedly aware, this Court finds them either not so obvious that an auditor must have known of them or not strong enough to support an inference of scienter. *See Stephenson*, 700 F. Supp. 2d at 623–24 (finding red flags not so obvious that auditor must have known of them); *Anwar*, 2010 WL 3341636, at *65 (rejecting red flags, if known to auditor, as indicative of intent to deceive); *In re Tremont Secs. Law, State Law and Ins. Litig.*, 703 F. Supp. 2d 362 (S.D.N.Y. 2010) (finding that red flag allegations against auditor of Madoff feeder fund did not establish scienter).

Furthermore, Plaintiffs do not adequately allege the Auditor Defendants knew of many red flags that supposedly would have led them to discover Madoff's fraud. The more plausible competing inference is that these Defendants, like others in the industry, did not find the information available to them so disturbing as to merit further investigation. *Cf. Anwar*, 2010 WL 3341636, at *68 ("[I]t is a more compelling inference that the PwC Member Firms were duped by FGG or were merely negligent in the exercise of professional duties they owed to the Funds."). Such allegations do not support a strong inference that the Auditor Defendants were aware of red flags and acted with scienter. *See Anwar*, 2010 WL 3341636, at *66 ("As in *South*

18

*Cherry,* the SCAC is replete with allegations that the defendants would have learned the truth as to those aspects of the funds if the defendants had performed the due diligence they promised." (internal quotation marks and alterations omitted)).  They do not support an inference of an intent "approximat[ing] an actual intent to aid in the fraud being perpetrated by the audited company." *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (internal quotation marks omitted).

Because Plaintiffs do not adequately plead scienter, the common law fraud claims against Defendants Anchin and ParenteBeard are dismissed.

**f.   Standing to Bring State Law Claims Against All Defendants**

**i.   Direct State Law Claims Against All Defendants**

Plaintiffs bring a number of state law claims.  Against the First Frontier and Auditor Defendants, Plaintiffs seek to recover directly for constructive fraud (Count V), negligent misrepresentation (Count VI), breach of fiduciary duty (Count VII), unjust enrichment (Count IX), and accountant's duty/accountant's malpractice (Count XI),[11] and seek to recover derivatively for breach of fiduciary duty and gross negligence and mismanagement (Count VIII).[12]  Against the Beacon and Ivy Defendants, Plaintiffs assert gross negligence and mismanagement, unjust enrichment, and aiding and abetting breach of fiduciary duty (Count X).[13]  Defendants assert that these claims, including those purportedly brought directly, are

---

[11] Plaintiffs also bring claims for common law fraud (Count III) and fraudulent concealment (Count IV) have already been dismissed *supra*.

[12] Plaintiffs identify which claims are derivative and which are direct in the Complaint at ¶ 11.  While the complaint does not state explicitly how they characterize the unjust enrichment claim, the pleadings identify only injury to the plaintiffs themselves, rather than the FF Fund, thus they are characterized here as direct.

[13] Although the Plaintiffs identify these claims as being direct in the Complaint, *see* FAC ¶ 11, they subsequently characterize them as derivative on behalf of the FF Fund.  *See* Pl. Opp. at 86.  As discussed *infra*, the distinction in pleading is irrelevant, as the claims would be dismissed under either theory.

derivative of the FF Fund and as such must be dismissed.[14]  First Frontier is a Delaware limited partnership, thus Delaware law applies to decide if a claim is direct or derivative.  *Debussy LLC v. Deutsche Bank AG*, No. 05 Civ. 5550, 2006 WL 800956, at *3 (S.D.N.Y. Mar. 29, 2006) (applying state law "to determine whether the suit may be brought directly on behalf of the shareholders, or whether it must be brought derivatively on behalf of the Trust").

Under Delaware law, "the determination of whether a fiduciary duty lawsuit is derivative or direct in nature is substantially the same for corporate cases as it is for limited partnership cases."  *Litman v. Prudential-Bache Props., Inc.,* 611 A.2d 12, 15 (Del.Ch. 1992) ("*Litman I*"). The Delaware Supreme Court recently revised the standard for determining whether a claim is direct or derivative in its decision in *Tooley v. Donaldson, Lufkin & Jenrette, Inc*., 845 A.2d 1031 (Del. 2004); *see also Albert v. Alex Brown Mgmt. Servs.*, No. Civ. A. 762-N, Civ. A. 763-N, 2005 WL 2130607, at *12 (Del. Ch. Aug. 26, 2005) (noting revision).[15]  The *Tooley* test provides that determining whether a claim is direct or derivative "turn[s] solely on the following questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)."  *Tooley*, 845 A.2d at 1033.  "The stockholder's claimed direct injury must be independent of any alleged injury to the corporation.  The

---

[14] Beacon also contends that the state law claims may not be brought derivatively by the Plaintiffs on behalf of the FF Fund because the claims properly belong to the Beacon Fund itself.  However, this point is moot given that Plaintiffs fail to meet the demand requirement. *See infra*.

[15] Plaintiffs suggest corporate law should not apply when the structure of a limited partnership deviates dramatically from the corporate model.  While there is some support for this theory, *see In re Cencom Cable Income Partners, L.P.*, No. C.A. 14634, 2000 WL 130629 (Del. Ch. Jan. 27, 2000); *Anglo American Sec. Fund, L.P., v. S.R. Global Intern. Fund, L.P.*, 829 A.2d 143 (Del. Ch. 2003), these cases were decided before *Tooley*.  Even assuming the cases remain good law, Plaintiffs do not adequately allege that the FF Fund differs so drastically from the corporate model.  Unlike the Plaintiffs in *Anglo-American*, all of the FF Fund's limited partners were injured in an identical way, and any potential recovery would be distributed to them on a pro rata basis. *Cf. Anglo American*, 829 A.2d at 152–53 (allowing claims to be brought directly because plaintiff had left the fund, and partners admitted after the reduction in value suffered no injury, thus derivative claims would "have the perverse effect of denying standing (and therefore recovery) to parties who were actually injured by the challenged transactions while granting ultimate recovery (and therefore a windfall) to parties who were not").

stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing any injury to the corporation." *Id.* at 1039.

The Court should not merely rely on "plaintiff's characterization of his claims in the complaint, but . . . must look to all the facts of the complaint and determine for itself whether a direct claim exists." *San Diego Cnty. Emps. Ret. Ass'n v. Maounis,* No. 07 Civ. 2618, 2010 WL 1010012, at *19 (S.D.N.Y. Mar. 15, 2010) (quoting *Dieterich v. Harrer*, 857 A.2d 1017, 1027 (Del. Ch. 2004); citing *In re Syncor Int'l Corp. S'holders Litig.*, 857 A.2d 994, 997 (Del. Ch. 2004) ("[U]nder *Tooley*, the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint.")). However, "there is no reason that some claims arising out of a case or controversy could not be direct while other claims arising out of that case or controversy are properly derivative." *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 610 (S.D.N.Y. 2010) (citing *Grimes v. Donald*, 673 A.2d 1207, 1212–13 (Del. 1996) ("[T]he same set of facts may result in direct and derivative claims.")). Accordingly the Court addresses whether each of Plaintiff's claims is direct or derivative in turn.

Using the *Tooley* test, Plaintiffs' direct claims for breach of fiduciary duty, unjust enrichment, and aiding and abetting breach of fiduciary duty are derivative in nature. Each is based on the alleged mismanagement of the FF Fund through the failure to conduct adequate due diligence and to discover and act upon red flags. "A claim for deficient management or administration of a fund is 'a paradigmatic derivative claim.'" *Albert v. Brown Mgmt. Serv.*, 2005 WL 2130607, at *12–13 (holding gross negligence and failure to provide competent and active management "clearly derivative" where "[t]he gravamen of these claims is that the Managers devoted inadequate time and effort to the management of the Funds, thereby causing their large losses." (citing *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) ("A

21

claim of mismanagement . . . represents a direct wrong to the corporation that is indirectly

experienced by all shareholders"))); *see also Litman I*, 611 A.2d at 15–16 (holding claim

derivative where "[t]he gist of plaintiffs' complaint is that the general partners breached their

fiduciary duties by inadequately investigating and monitoring investments and by placing their

interests in fees above the interests of the limited partners").

Assuming such acts constitute a breach of duty, the continued investment of the FF Fund

in Madoff's Ponzi scheme would necessarily injure the Fund.  *Stephenson*, 700 F. Supp. 2d at

610–11 ("If, as alleged, [fund and auditor] defendants breached a fiduciary duty by not

discovering that [the fund's] accounts were invested in what would become the most infamous

Ponzi scheme in recent history, it necessarily injured [the fund] in so doing.").  The diminution

in the value of partnership interests clearly is not a direct injury, because "[t]he diminution in the

value of their interests flows from the damage inflicted directly on the Partnership."[16]  *Litman I*,

611 A.2d at 16.  These claims may only be brought, if at all, derivatively.  As such, they are

dismissed.

However, Plaintiffs' constructive fraud, negligent misrepresentation, and accountant's

duty/accountant's malpractice claims against the FF and Auditor Defendants are direct to the

extent they allege inducement.  *Stephenson*, 700 F. Supp. 2d at 611–612 (finding gross

negligence, negligence, and fraud claims direct to the extent "that they allege (1) violation of a

duty owed to potential investors at large and (2) that such violations induced plaintiff to invest in

[the fund]").  "[R]ecovery on a claim based solely on inducement would only flow to those

individuals, such as [Plaintiffs], who were so induced."  *Id.*; *see also Albert v. Alex Brown Mgmt.*

---

[16] Plaintiffs' briefing supports this finding.  *See* Pl. Opp. at 77 (arguing Defendants have been unjustly enriched because "due to Defendants' misconduct, the Partnership is effectively out of business and its assets have been decimated").

*Servs.*, 2005 WL 2130607 at *12 (finding breach of contract and breach of fiduciary duty claims both based on failure to disclose were direct claims because holders "either lost their opportunity to request a withdrawal from the Funds from the Managers, or to bring suit to force the Managers to redeem their interests"). Plaintiffs assert they relied on the FF Defendants' statements in the PPM and other documents when deciding to purchase and retain limited partnership interests in the FF Fund. Thus Plaintiffs have standing to bring the claims directly.[17]

### ii.  Derivative State Law Claims Against All Defendants

The question of standing to bring a derivative suit is governed by the law of the state of organization. *See Halebian v. Berv*, 590 F.3d 195, 204 (2d Cir. 2009) (holding demand requirement, "in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation," is a matter of "substance" and therefore governed by state law). The FF Fund is a Delaware limited partnership, and the parties agree Delaware law governs its internal affairs. Under Delaware law, the pleading standard for demand futility in the limited partner context is "substantially the same" as the standard developed in the corporate context. *Gotham Partners v. Hallwood Realty Partners, L.P.,* No. 15754, 1998 WL 832631, at *4 (Del. Ch. Nov. 10, 1998).

Because "the decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation," *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990), the decision belongs to the General Partner, here Frontier Capital. Thus, a limited partner may bring an action to recover a judgment in favor of the partnership if the general partner has refused to do so "or if an effort to cause those general partners to bring the action is not likely to succeed." Del. Code Ann. Tit. 6, § 17-1003 (2006).

---

[17] While Plaintiffs have standing to bring these claims, they are nonetheless dismissed *infra*.

23

"Before limited partners may bring a derivative claim in The Court of Chancery, Delaware law requires the plaintiffs to make a demand on the general partner to bring the action or explain why they made no demand." *Seaford Funding Ltd. P'ship v. M & M Assocs. II, L.P.*, 672 A.2d 66, 69 (Del. Ch. 1995) (citing 6 Del. C. § 17-1001)[18]; *Litman I*, 611 A.2d at 17.

Defendants argue that Plaintiffs' derivative claims should be dismissed as to all Defendants because Plaintiffs have not made a demand, and demand is not excused. *See Haber v. Bell*, 465 A.2d 353, 357 (Del. Ch. 1983) (holding derivative claims must be dismissed if party brings them without first making demand, and demand is not excused). Plaintiffs acknowledge that they made no pre-suit demand on Frontier Capital.

In determining the sufficiency of a complaint to withstand dismissal based on a claim of demand futility, the court must decide "(1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment." *Levine v. Smith*, 591 A.2d 194, 205 (Del. 1991); *see Litman v. Prudential-Bache Props., Inc*., No. Civ. A. 12137, 1993 WL 5922, at *2–3 (Del. Ch. Jan. 4, 1993) ("*Litman II*") (applying rationale utilized in *Levine* to derivative claim in partnership context). Plaintiffs' pleading burden in the demand context is "more onerous than that required to withstand a Rule 12(b)(6) motion to dismiss." *Levine*, 591 A.2d at 207 (citing *Grobow v. Perot*, 539 A.2d 180, 187 n.6 (Del. 1988)); *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000) (holding plaintiffs must provide particularized allegations as to why demand would be

---

[18] Section 17-1001 states:
>   A limited partner or an assignee of a partnership interest may bring an action in the Court of Chancery in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed.

futile to survive a motion to dismiss; conclusory allegations are not enough).  Plaintiffs argue the

FF Fund's General Partner, Defendant Frontier Capital, is not independent and disinterested

because it benefited from the transaction at issue, and because it faces a substantial likelihood of

liability.[19]

First, Plaintiffs assert Frontier Capital is interested because it profited from the

transaction.  *See Bakerman v. Sidney Frank Imp. Co., Inc*., No. Civ. A. 1844-N, 2006 WL

3927242, at *7 (Del. Ch. Oct. 16, 2006) ("Disinterested means that directors can neither appear

on both sides of a transaction nor expect to derive any personal financial benefit from it in the

sense of self-dealing." (internal quotation marks omitted)).  However, that Defendants received

"substantial commissions, fees and other payments" does not suffice to show Defendants were

interested absent particularized facts demonstrating excessiveness of the fees or irregularity in

their receipt.  *Litman II*, 1993 WL 5922, at *3–4.  Only when the fee at issue "becomes so lavish

that a mechanical application of the presumption [of director disinterest] would be totally at

variance with reality" is there a need to excuse the demand requirement.  *Grobow v. Perot*, 526

A.2d at 923 n.12.  Plaintiffs categorically allege Defendants' fees were "excessive" but fail to

plead facts demonstrating they were anything but consistent with industry practice.  The cases

cited by Plaintiffs, *In re E-Bay, Inc. S'holders Litig.*, No. C.A. 19988-NC, 2004 WL 253521, at

*2 (Del. Ch. Jan. 23, 2004) (finding demand futility where directors who had received shares of

an IPO in what was alleged to be usurpation of corporate opportunity were "clearly interested");

and *Bakerman v. Sidney Frank Imp. Co.*, 2006 WL 3927242, at *8 (finding it too early to apply

weighing analysis as to defendants' benefit at the expense of the LLC where defendants appeared

---

[19] Plaintiffs also assert that demand is rendered irrelevant where, as here, the ongoing enterprise effectively ends.  Pl. Opp. at 82 (citing *Cencom*, 2000 WL 130629, at *4).  In *Cencom* the only claims at issue in the matter were against the dissolved limited partnership, and the claims related directly to the liquidation of that partnership.  That is simply not the case here, where Plaintiffs seek to recover from numerous entities besides Frontier Capital.

on both sides of a transaction because of their holdings in outside company to which funds were

allocated), are inapplicable where, as here, the benefit was in the form of regular advisory fees

paid to the general partner.

 Plaintiffs next assert that demand should be excused because Defendants face a

substantial likelihood of liability. "The mere threat of personal liability for approving a

questioned transaction, standing alone, is insufficient to challenge either the independence or

disinterestedness of directors." *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) (citing *Gimbel*

*v. Signal Cos., Inc.*, 316 A.2d 599 (Del. Ch.), *aff'd,* 316 A.2d 619 (Del. 1974)). Rather, the

transaction must "be so egregious on its face that board approval cannot meet the test of business

judgment, and a substantial likelihood of director liability therefore exists." *Id*. Similarly, the

Delaware Supreme Court has rejected the notion that "approval of a challenged transaction

automatically connotes 'hostile interest' and 'guilty participation' by directors, or some other

form of sterilizing influence upon them." *Aronson*, 473 A.2d at 814.

 The remaining claims under which the FF Defendants could potentially face liability

include the derivative claim for breach of fiduciary duty and direct claims for constructive fraud

and negligent misrepresentation. These claims are likely barred by the exculpatory provision

contained in the FF Fund's Limited Partnership Agreement ("LPA"), which limits liability to

acts of "willful misconduct, gross negligence or fraud." *See* Brody Decl., Ex. A at 81, § 3.04.

Plaintiffs do not sufficiently plead the knowledge required to create a substantial likelihood of

liability here.[20] *See Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (where "directors are

exculpated from liability except for claims based on 'fraudulent,' 'illegal' or 'bad faith' conduct,

a plaintiff must also plead particularized facts that demonstrate that the directors . . . had 'actual

---

[20] As discussed *supra*, Plaintiffs claims for securities fraud, common law fraud, and gross negligence fail because
Plaintiffs do not sufficiently plead intentional or reckless behavior.

or constructive knowledge' that their conduct was legally improper" to demonstrate demand futility based on substantial likelihood of liability).

Finally, Plaintiffs allege that the decision to invest in Beacon without proper investigation could not have been a product of valid business judgment.  This assertion is based on the theory that Defendants should have known or discovered that Madoff was a fraud, a theory which Plaintiffs do not adequately plead.

Because Plaintiffs do not satisfy the demand requirement, the derivative claims against all Defendants on behalf of the FF Fund are dismissed.

Plaintiffs here are not left without remedy.  The FF Fund is a member of the putative class in a suit against the Beacon, Ivy, and BONY Defendants, including the individuals Danzinger, and Markhoff, which recently survived a motion to dismiss.  *In re Beacon*, 2010 WL 3895582.  Plaintiffs offer no reason why Defendant Frontier Capital could not exercise its business judgment to determine whether the Fund should continue as a class member rather than bring an independent suit.

### g.   Remaining State Law Claims

Direct claims for constructive fraud and negligent misrepresentation remain against the FF and Auditor Defendants.  The Auditor Defendants also face a claim for breach of accountant's duty/accountant's malpractice (Count 11).

### i.   Additional State Law Claims Against the FF Defendants

To state a claim for negligent misrepresentation under New York law, a plaintiff must allege that (1) the parties stood in some special relationship imposing a duty of care on the defendant to render accurate information, (2) the defendant negligently provided incorrect information, and (3) the plaintiff reasonably relied upon the information given.  *DIMON Inc. v*

27

*Folium, Inc.*, 48 F. Supp. 2d 359, 373 (S.D.N.Y. 1999) (citing *Pappas v. Harrow Stores, Inc,* 140 AD2d 501, 504 (2d Dep't 1988)). Constructive fraud requires: (1) a fiduciary or confidential relationship between the parties; (2) a misrepresentation or omission of material fact; (3) which was made with the intention of inducing reliance; and (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff. *Burrell v. State Farm & Cas. Co.*, 226 F. Supp. 2d 427, 438 (S.D.N.Y. 2002).

Defendants assert that the limitation of liability clause included in the Limited Partnership Agreement bars these claims. *See* Brody Decl., Ex. A at 81, § 3.04 (limiting liability to acts of "willful misconduct, gross negligence or fraud"). Delaware law authorizes limited partnerships to restrict, or even eliminate, common-law duties, including fiduciary duties, in the limited partnership agreement.[21] 6 Del. Code Ann. § 17-1101(d), (f); see, e.g., *Kahn v. Icahn*, No. 15916, 1998 WL 832629, at *2 (Del. Ch. Nov. 12, 1998) (partners may "agree on their rights and obligations to each other and to the partnership . . . even where Delaware law might impose different rights and obligations absent such agreement"), aff'd, 746 A.2d 276 (Del. 2000).

Plaintiffs argue that "the alleged misconduct falls outside the scope of the protection afforded by the exculpation clauses" because exculpatory clauses cannot shield a Defendant from liability for willful or grossly negligent acts, or violation of the duty of good faith. Pl. Opp. at 74 (citing *Official Comm. of Unsecured Creditors* v. *Donaldson, Lufkin & Jenrette Secs. Corp.*, No. 00 Civ. 8688 (WHP), 2002 WL 362794 at *15 (S.D.N.Y. Mar. 6, 2002); *Collins & Aikman* v. *Stockman*, No. Civ. 07-265-SLR-LPS, 2009 WL 1530120 at *20 n. 14 (D. Del. May 20, 2009)).

---

[21] The parties disagree as to whether Delaware or New York law governs the agreement. Here, the distinctions are not relevant, as the agreement would bar Plaintiffs' claims under both theories. *See Colnaghi, U.S.A., Ltd. v. Jewelers Protection Servs., Ltd.*, 81 N.Y.2d 821, 823 (N.Y. 1993) ("New York law generally enforces contractual provisions absolving a party from its own negligence.").

Here, however, Plaintiffs' claims for fraud and gross negligence have already been dismissed. The remaining claims do not involve elements of willful or bad faith conduct.

### ii.  Additional State Law Claims Against the Auditor Defendants

Claims for negligent misrepresentation, constructive fraud, and accountant's liability each require a special relationship between the plaintiffs and defendants.  Plaintiffs acknowledge that they were not in direct privity with either of the accounting firms.  Pl. Opp. at 88.  But under the doctrine established in *Credit Alliance Corp. v. Arthur Andersen & Co.*, Plaintiffs say their relationship with Defendants was "near privity."  65 N.Y.2d 536 (N.Y. 1985).  In *Credit Alliance*, the New York Court of Appeals set forth a three-part test to determine when parties, who are not in direct privity with the accountants, have a relationship sufficient to hold them accountable in a negligence action.  *See Id*.  The Court required:

> (1) the accountants must have been aware that the financial reports were to be
>
> used for a particular purpose or purposes; (2) in the furtherance of which a known
>
> party or parties was intended to rely; and (3) there must have been some conduct
>
> on the part of the accountants linking them to that party or parties, which evinces
>
> the accountants' understanding of that party or parties' reliance.

*Id.* at 551.  Plaintiffs do not allege any facts that would support finding a relationship between the Plaintiffs and either Defendant under this test.  Plaintiffs allege only that they "receive annual and quarterly financial statements,"  FAC ¶¶ 80, 83, and that the Auditor Defendants "knew that their respective audited and other financial reports would be provided to the Fund's Members and potential investors in the Fund and would be relied on by them in making investment decisions concerning the Funds."  FAC ¶ 154.  This broad allegation of a duty owed to all potential investors is not sufficient to demonstrate a "near privity" relationship.  Furthermore, in

the case of Anchin, it is difficult to see how Plaintiffs can plausibly claim to have relied on the statements they received given that Defendants expressly disclaimed any duty to audit or otherwise verify the underlying data on which it relied.  *See* FAC Ex. C; Pl. Opp. Ex. C.

Because Plaintiffs do not allege a confidential or fiduciary relationship, the remaining state law claims are dismissed as to the Auditor Defendants.

## IV. Conclusion

For the reasons set forth herein, Defendants' motions to dismiss are granted in full.


SO ORDERED.

Dated:  December 22, 2010

New York, NY

U.S.D.J.

30